## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:14-CR-090-TCB-AJB** |
| **WILLIAM KIMBRELL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are Defendant William Kimbrell's motions to suppress evidence, [Docs. 12 (preliminary), 27 (amended)], and statements, [Docs. 13, 37]. The Court held an evidentiary hearing on the motions to suppress statements, [Doc. 43 (hereinafter T__)], and the parties filed post-hearing briefs, [Docs. 44, 48 (Kimbrell); 47 (government)]. With briefing complete, the motions are ripe for recommended resolution. For the following reasons, the undersigned **RECOMMENDS** that the motions be **DENIED**.

### *Facts*

Kimbrell is charged in a two-count superseding indictment with receiving child pornography in October 2013, in violation of 18 U.S.C. §§ 2252(a)(2) & (b)(1) (Count One), and accessing child pornography with intent to view the same between

October and December 2013, in violation of 18 U.S.C. §§ 2252(a)(4)(B) & (b)(2) (Count Two).  [Doc. 15].  The charges followed the execution of two federal search warrants executed at Kimbrell's Covington, Georgia, residence (hereinafter "the subject residence") on March 13 and 14, 2014, and statements that he made to law enforcement before and during the execution of the first search warrant.[1]

The first search warrant, No. 1:14-MC-223, was issued March 11, 2014, and executed March 13, 2014.  [Doc. 27-1].  The affiant was Homeland Security Investigations, Immigration and Customs Enforcement ("HSI/ICE") Special Agent Anthony Scott.[2]  In his affidavit, Scott averred that in October and December 2012, the Liberty County (Georgia) Sheriff's Office ("LCSO") initiated an investigation in the Statesboro, Georgia, area into the distribution of child pornography over the Internet

---

[1]     Kimbrell initially was indicted on March 18, 2014, for the charge that is contained in Count Two of the superseding indictment.  [*Compare* Doc. 1 *with* Doc. 15].

[2]     Scott had been a HSI/ICE SA since April 2009.  T4-5.  He received specialized training in investigation of child pornography trading on Peer-to-Peer ("P2P") networks and had been involved in P2P investigations since April 2010.  [Doc. 27-1 at 6].  Relevant to this case, Scott also has been the case agent and participated in child-pornography investigations, including the execution of a number of child-pornography/child-exploitation search warrants, has received training in the area of child-pornography and -exploitation cases, and has observed and reviewed numerous examples of child pornography in all types of media, including computer displays.  [*Id.*].

2

using the Ares P2P file-sharing network.  [*Id.* at 9].[3]  Scott set out in the supporting

affidavit that from his investigation, training, and experience, child-pornography

collectors and distributors maintain their collections of child pornography in a safe and

secure environment such as their homes and home computers and that they rarely, if

ever, dispose of their child pornography.  [*Id.* at 8-9].  He also stated that, from his

experience, he knew that P2P networks are frequently used to trade child pornography

and that the Ares network is used to trade digital files containing still images and movie

files of child pornography.  [*Id.* at 10].  He described how digital images contain a

unique Secure Hash Algorithm ("SHA-1") akin to a digital signature; that SHA-1

signatures provide a certainty of over 99.99% that two or more files with the same

SHA-1 signature are identical copies of the same file regardless of their file names; and

how the Ares network uses SHA-1 values to organize its files and improve

efficiency.  [*Id.* at 11-12].  He also explained that law enforcement had modified the

---

[3]      Scott explained that P2P file-sharing is a method of communication available to Internet users through special software.  Computers linked together through the Internet using this software form a network that allows the sharing of digital files among the users of the network.  A user first downloads the P2P software from the Internet.  The software allows the user to set up files on the user's computer to be shared with others running compatible P2P software.  A user obtains files by opening the P2P software on his computer and conducting searches for files being shared on another user's computer.  [Doc. 27-1 at 9].

Ares program through "RoundUp Ares" to allow the visual "capture" of an individual computer's IP address so that law enforcement can discover from which computer's IP address child pornography had been offered for distribution.  [*Id.* at 11-12].  Using RoundUp Ares, on October 5, 2012, Charles Woodall, a LCSO detective, queried for a list of IP addresses in Georgia that were making available for distribution known or suspected files of child pornography, based on SHA-1 values previously identified by law enforcement as child pornography, and received a result for IP address 74.44.237.110, believed to be located in Statesboro, Georgia.  Between October 6 and December 1, 2012, a direct connection between that IP address and the LCSO's RoundUp Ares program showed files that were available for download from IP address 74.44.237.110, and Woodall downloaded three files from that IP address that consisted of videos of sexually explicit conduct between adult males and prepubescent females.  [*Id.* at 13-14].  During this time frame,  IP address 74.44.237.110 also was offering suspected child-pornography files for download on the Gnutella P2P file sharing network from IP address 184.37.254.241, which was located in the Northern District of Georgia and assigned to Internet Service Provider ("ISP") AT&T; on January 30, 2013, Woodall downloaded two videos showing underage children engaged in sexually explicit conduct from the computer at that latter IP address.   An

4

administrative subpoena to AT&T established that William L. Kimbrell was the subscriber for that IP address through February 2013 at the subject residence in Covington, Georgia. [*Id.* at 15-16].[4]   Another administrative subpoena disclosed that IP address 74.44.237.110 was a Wi-Fi hotspot at the Woodlands Apartments complex adjacent to Georgia Southern University ("Georgia Southern"), and Woodall learned that Defendant lived in that apartment complex when he attended Georgia Southern. [*Id.* at 17-18].  Further investigation revealed that the subject residence now had a new IP address as of July 31, 2013, and that IP address was serviced by Charter Communications, but that none of the P2P networks that commonly are used to trade child pornography returned a positive match with that new IP address for available child pornography.  [*Id.* at 17].  Still, Scott averred that, based on his experience in investigating child-pornography distributors and collectors, the fact that it had been fourteen months since an IP address associated with Kimbrell had offered child pornography for distribution did not mean that child pornography was not likely to be found on computers in the subject residence, where law enforcement determined Kimbrell presently was residing.  [*Id.* at 18-19].  As a result, Scott sought, and was

---

[4]      Defendant's full name is William Matthew Kimbrell.  [Doc. 27-1 at 17]. William L. Kimbrell is his father.

5

granted, permission to search Kimbrell's residence for "evidence, fruits and instrumentalities of the receipt, distribution, and/or possession of visual depictions, and other related materials, involving minors engaged in sexually explicit conduct (child pornography), as defined in [18 U.S.C. § 2256]. . . ." [Doc. 27-1 at 25].

On March 13, 2014, the date the warrant was to be executed, at approximately 4:30-5:00 p.m., Scott and HSI/ICE SA Michael Ashley went to Kimbrell's place of employment, Westside Middle School in Winder, Georgia, where Defendant was a teacher. T6, 18; [*see also* Doc. 27-1 at 18]. The school day was over. T6. Before they arrived, the agents had notified the school security guard that they were coming to the school. T23. The agents were dressed in plain clothes, and their weapons were concealed. T6-7. They approached Kimbrell, who was accompanied by a school colleague, in the parking lot of the school. The agents identified themselves and stated they were there pertaining to a matter relating to computers. They asked Kimbrell if he wanted to speak with them away from his coworker. T7. The agents spoke to him in a conversational tone. T7. The female coworker was still in the vicinity but at some point Kimbrell asked her to excuse him while he talked with the agents. T20-21.

The agents told Kimbrell that his computer came back to an IP address at his current residence as trading child pornography. T20. Kimbrell acted very surprised.

6

T20.  They asked Kimbrell general questions about child pornography being distributed or received from any of his computers.  T18.  He denied knowledge of any child pornography on any computer to which he had access.  T24.  Kimbrell was asked and gave permission in writing to search his vehicle for computers or other electronic storage devices.  T7-9, 23; Govt. Ex. 1.  The car was searched but nothing of evidentiary value was located.  T9.  The search of the vehicle only took five minutes.  T22.  While Scott and Ashley searched his car, Kimbrell stood outside of the vehicle.  T46.  Kimbrell volunteered that he had media devices in his classroom, and he asked if the agents wanted to go with him to retrieve those items.  T9, 22.  Scott interpreted Kimbrell's actions and statements as an effort to clear his name.  T22.  The agents followed Kimbrell into the building, and located and seized five thumb drives and an external hard drive that were at the computer station in his classroom.  T10, 23, 46.  The school security guard and the principal were present in the classroom.  T23.  The encounter at the school lasted twenty to thirty minutes, during which time Kimbrell was not touched or patted down by the agents.  T46.

The agents told Kimbrell that other agents were searching his residence pursuant to warrant and that Scott was going to the residence.  T21-22, 24.  Scott did not instruct Kimbrell about where to go once Scott left.  T24.  Scott then left the school and drove

7

to the subject residence, which was located thirty to forty-five minutes away from the school. T10. When Scott arrived, he first spoke with his supervisor. T25. The search pursuant to the warrant was in progress, and Kimbrell was already at the house. T11. Kimbrell was seated in the TV/living room area with his mother and father, and they were watching television. T11, 26, 27. At least two local sheriff's deputies, with whom Kimbrell's father worked, were present. T11-12, 28, 47.[5] In addition to the uniformed deputies, there were at least six other law-enforcement officers at the residence during the search. T29. Each law-enforcement officer arrived in a separate vehicle, and the vehicles were parked in front of the Kimbrell residence. T46-47. The family members were not free to move about the home at will, but they could use the restroom. T12. Scott was not aware of any instructions to the family that they had to remain at the residence. T12. Although he was unaware of instructions given to Kimbrell and his parents in this case, the typical advice to occupants of residences being searched is that if they needed to use the restroom or do something in the residence, they could, but they would have to be escorted. T27.

_____

[5]     Defendant's father worked at the sheriff's department but was not a law-enforcement officer. T47.

8

Three to five minutes after Scott arrived at the Kimbrell residence, he approached Kimbrell and asked if he would like to speak with him further.  When Kimbrell stated that he would, Scott asked if he would like to go to a more private area or speak where he was located.  T13, 30.  Kimbrell chose to go to a more private place.  T13.  Kimbrell led Scott, HSI/ICE SA Luther Frey, and LCSO Detective Woodall to his parents' bedroom, which was on the main level of the residence.  T13.[6]

The bedroom was fifteen by twenty feet, but with the bed and other furniture, Scott described it as not a large room.  Kimbrell sat towards the right side of the head of the bed, which was straight into the room against the far wall, closest to the dresser. T13-14.  Scott and Frey were on the left side of the bedroom, and Woodall stood on the same side of the bed as Kimbrell.  T14.  The door was closed.  T47.

The interview was partially recorded, and it is contained in two separate DVD files.  T15, 40; Govt. Ex. 2 (hereinafter "1DVD __" and "2DVD __").  As they began, Scott told Kimbrell that he was not under arrest, and that Scott wanted to make "sure that he knew he was speaking to us under his own free will and accord."  T14; 1DVD 00:40.  Scott stated they were trying to determine if anyone in the house was

---

[6]     Prior to interviewing Kimbrell, Scott and Woodall spoke with Kimbrell's father in the same bedroom.  Scott stated that the interview was very short.  T50, 51. Kimbrell's mother was not interviewed.  T51.

trading child pornography. 1DVD 1:11. The agents said that they wanted to determine Kimbrell's whereabouts at the time child pornography was downloaded from computers associated with him (Fall of 2012 in Statesboro and January 2013 in Covington). Kimbrell stated that he graduated in May 2012 and that he was not at the school or in Statesboro in August through December 2012, because he already had started teaching. 1DVD 1:20, 2:08, 2:45, 5:57.

Kimbrell stated he used a blue Toshiba laptop while at school, and he brought that computer back to the subject residence when he finished school, but when he was back in the Atlanta area, he used it only sporadically. 1DVD 8:15-10:15. Kimbrell was questioned about the use of that computer in Statesboro and at the subject residence. He stated that he downloaded "a lot" of music and recalled using the Ares P2P network for music downloads for a short period of time. 1DVD 10:38. One of the agents stated that after the home ISP changed from AT&T to Charter, the IP address associated with the subject residence was observed also to have been offering child pornography for distribution. 1DVD 12:46. The agents asked a series of questions about Kimbrell's college roommate and then stated that if Kimbrell told them that there "was something" in the house and it was located on Kimbrell's computer, the agents could stop looking at other persons in the house or in Statesboro. 1DVD 13:00. He was reminded of his

AO 72A
(Rev.8/82)

prior statement (presumably while he was interviewed at the school) that while in college he was attempting to download music (when searching for "Billboard Top 100"), got "a couple hundred" child-pornography images and videos inadvertently contained on a zip file, and deleted them.  1DVD 13:50-14:15.

Woodall explained that during his investigation, he downloaded "a lot" of child pornography from Kimbrell, and Woodall wanted to know what "makes you tick" "because you don't seem like a bad person."  1DVD 16:03.  Kimbrell was told that they were trying to find a way to explain this so that they could get out of there and leave his family alone, and not to bring anyone else in that did not need to be involved. 1DVD 16:09-16:40.  The agents explained that they were not trying to embarrass him, and that, for example, they thought that only he would be at the school that late in the day, and they were surprised when he was seen with colleagues.  Still, they were looking for an explanation of the availability of downloads of child pornography from computers associated with him.  1DVD 17:05.  Kimbrell was advised that in January 2013, law enforcement downloaded child pornography from a computer at the subject residence that had the "same software serial number that was used in Statesboro." 1DVD 17:26.  Kimbrell was told that items could not really be deleted from the computers and that the agents preferred to be told which computers (there were several

11

devices capable of displaying child pornography present in the subject residence) that he had used for downloading, as opposed to finding the materials after his denials. 1DVD 17:58.  Although the agents stated that all they wanted was an explanation, Kimbrell stated he did not have one.  1DVD 18:12.

Kimbrell was told that the agents wanted him to explain what happened even if he viewed the child pornography simply out of curiosity.  1DVD 20:18.  Kimbrell denied viewing child pornography purposefully, stating that he had to do "tons and tons" of research at school on adolescent children.  1DVD 20:45-21:00.  He stated that he was unfamiliar with a video that Woodall downloaded titled, "7 year old Moscow girl pthc," and that he did not search for a title like that specifically.  1DVD 23:20.  He acknowledged that when on P2P networks, a user would have to key in specific search terms in titles in order to locate materials.  1DVD 23:50.  He also stated that he thought they were trying to get him to incriminate himself for something he had not done. 1DVD 30:27.  Kimbrell also stated that if he did inadvertently download files containing child pornography, he would delete them as soon as he realized what they were, and therefore there could be "sporadic" files that were deleted other than the zip file containing music that he mentioned earlier.  1DVD 34:00-35:40; 36:15.

He then was asked about his understanding about how P2P networks worked, and he stated that he assumed the program allowed a user to search only a specific file on another user's computer for privacy purposes. 1DVD 38:19. He was told that therefore the only way law enforcement could have received files from him is if they were purposefully put in that specific folder on his computer that was then offered for sharing through the P2P network. Kimbrell suggested that this could have happened if he was downloading files and left the program open. 1DVD 40:51. He also stated that he would not have kept unwanted files for a month at a time. 1DVD 41:24. At approximately the forty-two minute mark, Scott turned off the recorder because he thought they were at a point where the interview was over. T16; 1DVD. Scott believed that since Kimbrell had denied everything, they were not making "headway." T39.

Woodall had left the bedroom a few minutes before Scott ceased recording in order to check on the progress of the search, and then he returned and stated to Scott that "some artifacts"[7] were discovered during the process of previewing computers at the subject residence. T16. Scott left the room to speak with the forensic agents for

---

[7]     Scott described "artifacts" as bits of data stored on a computer that uses P2P software. These data bits reflect file structure and file names, among other things. T48. He did not know if Kimbrell was advised that artifacts were found, or whether Kimbrell understood what artifacts were. T49.

13

approximately two minutes, and when he returned, Woodall was questioning Kimbrell about what the forensic agents stated they saw on the computer(s), T31, so he turned on the recorder again, T16, 42-43.

As the second portion of the recording began, Kimbrell was responding to Woodall's statement that there were twenty-five files on his computer that were being shared through the P2P program. 2DVD 0:10. There then followed a discussion about Kimbrell's motivation for accessing these files in the first place. After the questioning turned to his relatively small physical size, Woodall asked him if that played a part in his downloading the files to satisfy his curiosity. Kimbrell stated, "I suppose yes." 2DVD 2:28. He stated he was curious, but "it wasn't a sustained thing." 2DVD 3:00.[8]

At 2DVD 10:00, Scott resumed his questioning of Kimbrell, and Woodall left the room again, with the admonition to Kimbrell "to be straight with him." He still stated that his initial downloads were inadvertent, but he recognized that it was child pornography. 2DVD 12:00. He felt remorse over his actions. 2DVD 13:09. He stated that he downloaded the images, looked at them, and deleted them. 2DVD 14:17. He

---

[8]    At approximately 2DVD 07:50, Woodall explained to Scott that while Scott was out of the room, it appeared to Woodall that Kimbrell was not comfortable talking about some things, and as Scott was reentering the room, Kimbrell began to explain his actions.

14

estimated downloading "a couple hundred" images and deleting them once he recognized what they were.   T44-45; 2DVD 15:07; *see also* 2DVD 31:43.   He acknowledged looking at still images and at the videos for one minute or so to see what was on them.  2DVD 15:28.  He described the search terms he used ("twink," "milk," "new boy"), 2DVD 16:30, and stated that if he searched for files with "pthc" in the title, that was because that was in the titles already downloaded.  2DVD 16:38.  He stated that he deleted everything he ever downloaded.  2DVD 19:12.  He denied being in Statesboro after he graduated.  2DVD 21:55.  He also claimed to have downloaded child pornography in his effort to download or view adult pornography "on the younger age of the adult porn."  2DVD 27:45.  The agents were not particularly satisfied with that response, but the encounter did not become confrontational in tone.  2DVD 30:47. The second recorded portion of the interview last slightly over thirty-four minutes. 2DVD.  The total interview lasted less than eighty minutes (42 + 34 + the two minutes Scott said that he was out of the room with the recorder off).

The tone of the questioning throughout both recorded sessions was conversational and respectful between Kimbrell and the agents.  At times, the agents and Kimbrell laughed.  At no time did the agents raise their voices during the recorded portions of the questioning.  In addition, no law enforcement agent made any promises

15

to Kimbrell or threatened him during any of the questioning, nor did Kimbrell appear to be under the influence of drugs or alcohol.  T17.  The record also reflects that at no time did Kimbrell state that he wanted to leave the room or stop answering questions. *See also* T17-18.

No files containing child pornography were located during the execution of the first search warrant (nor on the devices seized at the middle school), nor were any computer devices seized from the subject residence as a result of the first warrant's execution.  T44.  The agents left the residence ten to fifteen minutes after they stopped questioning Kimbrell.  Kimbrell was not arrested.  T44, 51.

The second search warrant, No. 1:14-MC-234, was applied for, issued and executed on March 14, 2014.  [Doc. 27-2].  In that supporting affidavit, Scott repeated the probable cause section of the earlier warrant application and added the following facts.  He stated that the first warrant was executed on March 13, 2014.[9]  Scott stated that as to the fruits of the execution of the first warrant:

> Agents observed but did not take one computer—a blue Toshiba laptop computer—at the time of the execution of the warrant.  A preview of that computer showed that child pornography images were accessed but had

---

[9]     The warrant application incorrectly noted that the first warrant was issued and executed in 2013.  [*See* Doc. 27-2 at 18-19].  Based on the evidence, the use of the wrong date is treated as a typographical error.

16

subsequently been deleted.  The file names were found in one or more shared folders on the Toshiba laptop.   The folders contained approximately 23 names of files that are believed to have contained child pornography.  Kimbrell was interviewed and stated that he had previously downloaded approximately 200 files containing child pornography, but the agent conducting the preview could only find 23 file names.  As noted above, it is a violation of federal law to knowingly access with intent to view child pornography.

[Doc. 27-2 at 19].  As a result, he concluded, he believed that child pornography images

"were and are present on the" computers at the residence.  [*Id.* at 22].  He also alleged

in Attachment B to the application, as follows:

Based upon the preceding information, there is probable cause to believe that currently located within the subject premises, as described in Attachment A, are evidence, fruits, and instrumentalities of the receipt, distribution, and/or possession of visual depictions, and other related materials, involving minors engaging in sexually explicit conduct (child pornography), as defined in [18 U.S.C. § 2256], including a blue Toshiba laptop computer and any other computer or electronic media device that contains evidence that the defendant has accessed and viewed one or more images of child pornography. . . .

[Doc. 27-2 at 25].

17

### *Contentions of the parties*

In his amended motion to suppress, [Doc. 27],[10] Kimbrell first argues that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the grounds that Scott's affidavit for the second search warrant contained statements that were materially untrue, since he stated that child pornography images were on the premises, but in executing the first warrant, law enforcement saw that there were no child-pornography images on Kimbrell's computers, and no such images were discovered or seized in executing that first warrant. [Doc. 27 at 9]. Kimbrell also contends that the second warrant application omitted the material fact that agents did not locate any child-pornography images on Kimbrell's computer during the first search when Scott represented in the second warrant application that searching agents located twenty-three names of files that he believed contained child pornography, nor did he include in his affidavit that the presence of such file names did not mean that someone viewed those files. [*Id.* at 10].

Moreover, in his motions to suppress statements, Kimbrell contends that his statements were not voluntary and that he was effectively in custody and thus entitled

---

[10]     Kimbrell's initial motion was styled a preliminary motion because defense counsel had not yet received the search-warrant affidavits in discovery. [Doc. 12 at 2].

18

to be advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). [Doc. 13 at 3; Doc. 37 at 1]. In addition, in his post-evidentiary hearing brief, he argues that he was in custody and entitled to *Miranda* warnings before being questioned because the tone of the questioning during the second part of the interview was distinctly different from the first portion and more accusatory in nature. He adds that the following facts demonstrate that he was in custody: (1) he was the target of a child-pornography investigation; (2) he first was questioned at his place of employment where school personnel were present and made aware of the nature of the investigation; (3) being a teacher made it more likely he would cooperate with law enforcement to protect his job; (4) he was told while still at school that his home was being searched; (5) he arrived home, in the dark, and numerous law enforcement vehicles were present; (6) law-enforcement officers, including uniformed and armed sheriff's deputies, were in his home; (7) he and his parents were confined to the living room and guarded by a deputy during the search and were not free to move about the residence unescorted; (8) he was questioned in a small bedroom behind closed doors, isolated from the rest of his family; (9) he was never told that he was free to leave; (10) he was only told once (early in the first part of the interview) that he was not under arrest and did not have to talk; (11) three law-enforcement officers questioned him in a small bedroom;

19

(12) during more than a forty-minute interrogation, he denied intentionally downloading any child pornography in response to repeated questioning; and (13) only after discovering file names indicative of child pornography, the agents initiated a second round of questioning with a focus on the newly discovered incriminating evidence. [Doc. 44 at 9-10].

In addition, Kimbrell attempts to distinguish two cases the Court mentioned at the evidentiary hearing, *United States v. Asher*, No. 1:09-cr-414-JOF/AJB, 2010 WL 4192883 (N.D. Ga. Feb. 25, 2010) (R&R) (Baverman, M.J.), *adopted at* 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010) (Duffey, J.), and *United States v. Peck*, 17 F. Supp. 2d 1345 (N.D. Ga. 2014) (Totenberg, J., *adopting* Baverman, M.J.). In both cases, the undersigned concluded that the suspects, who were interviewed in their homes in conjunction with the execution of search warrants for child pornography, were not in custody and not entitled to *Miranda* warnings. He argues that the questioning in the present case was in relative isolation in a closed room with three agents, while Asher was questioned at his dining room table, and although Peck was in a closed bedroom, the other agents who were searching the residence could be heard through the closed door, so the Court concluded that Peck was not in complete isolation. [Doc. 44 at 11]. He argues that unlike in *Asher*, where the defendant

20

repeatedly was told that he was not under arrest, Kimbrell was only told that he was not under arrest at the beginning of the interview, well before the questioning became accusatory.  He also contends that his questioning lasted at least seventy-six minutes while in *Asher* it was forty-five minutes and in *Peck* it was one hour.  [*Id.* at 11-12]. He argues instead that the present case was more like *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), where the defendant, a member of the Air Force, was questioned about child pornography by several investigators in a closed storage room in his home.  Other law enforcement agents from multiple agencies, as well as the defendant's supervisor, were present in the home.  Although the defendant was advised he was not under arrest, the *Craighead* court concluded he was in custody and entitled to *Miranda* warnings because the home had "become a police-dominated atmosphere" when the defendant was escorted to a closed storage room in his own home and sat on a box while the door was guarded by an armed officer.  *Id.* at 1089.  Kimbrell argues that his case is similar for the following reasons: there were multiple law-enforcement agents from different jurisdictions (HSI/ICE, LCSO, Newton County Sheriff's Office); law enforcement advised his superior (the middle school principal) that he was being questioned about a criminal investigation; and he was escorted into a closed room and isolated from his family members during a lengthy interrogation.  He argues that under

the totality of the circumstances, he was in custody and entitled to *Miranda* warnings, and because he was not so warned, his statements must be suppressed.  [Doc. 44 at 13].

In response,[11] the government argues that under the totality of the circumstances, Kimbrell was not in custody and therefore not entitled to *Miranda* warnings.  It points out that the agents' first encounter with Kimbrell was at his job, and the agents waited until school let out and he was walking to his vehicle.  He consented in writing to the search of his vehicle and volunteered that he had media devices in his classroom, and he led the agents to the classroom where they seized the electronic-media devices.  The government argues that the entire episode at the school was free from coercion and not

---

[11]    The government argues that because Kimbrell did not address his challenge to the search warrants in his post-hearing brief, he should be deemed to have abandoned his challenge to the warrants.  [Doc. 47 at 2 n.1].  While it would have been better if Kimbrell had addressed his challenges to the warrants, in all fairness, the Court did not grant Kimbrell an evidentiary hearing on the motion to suppress evidence and advised him at the hearing that he was not entitled to a *Franks* hearing because even if there were some material misstatements in the warrant application, Kimbrell's admission that he downloaded 200 child-pornography files provided sufficient probable cause to authorize the second search warrant.  Thus, the validity of the second search warrant turned materially on whether Kimbrell's statements were voluntarily obtained.  As noted in the text, the Court concludes they were and thus the warrant was validly issued.  However, the Court does not find that Kimbrell abandoned his motion to suppress the fruits of the search warrant.  [*See also* Doc. 48 (Kimbrell explaining why he did not address the search issues in his post-hearing brief)].

custodial, which environment laid the groundwork for the non-custodial questioning at the residence.  [Doc. 47 at 7].

The government next argues that Kimbrell chose to come to his residence and arrived there before Scott.  It contends that Kimbrell agreed to talk to Scott again and that he chose to be interviewed in private and chose his parents' bedroom.  It continues that Kimbrell was not touched or patted down, no weapons were displayed, and he was not handcuffed.  He was told from the outset that he was not under arrest.  [*Id.* at 8].

As for the facts Kimbrell claims showed that he was in custody, the government argues that the Eleventh Circuit has held that the fact that a suspect is the focus or target of an investigation does not trigger the need for *Miranda* warnings.  [*Id.* at 8-9 (citation omitted)].  As for Kimbrell's claim that his job made it more likely he would cooperate, the government argues that the proper standard for defining custody for *Miranda* purposes is an objective one—how a reasonable innocent person would perceive the situation—and not based on a subject's particular occupation.  [*Id.* at 9 (citation omitted)].  It next argues that Kimbrell was not in custody simply because his freedom of movement was restricted in his home while a search warrant was being executed, as officers are allowed to restrict the occupants' movements while executing a warrant at

AO 72A
(Rev.8/82)

a residence.  [*Id.* (citing *Michigan v. Summers*, 452 U.S. 692, 703-04 (1981), and *United States v. Opoku*, 210 Fed. Appx. 848, 852 (11th Cir. Dec. 13, 2006)].

The government furthers counters Kimbrell's argument that the size of the room in which he was questioned favors a finding of custody, arguing that Kimbrell voluntarily agreed to speak with Scott again and chose the room in which to be questioned in private.  [*Id.* at 10].  It also argues that there is no requirement that a suspect be repeatedly warned that he did not have to talk or advised that he was not under arrest.  [*Id.* at 10-11].

The government also points out that questioning that lasted two and one-half hours—far longer than that here—as been found not to constitute custody requiring *Miranda* warnings. [*Id.* at 11 (citing *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001); *United States v. Muegge*, 225 F.3d 1267, 1269 (11th Cir. 2000)].

Finally, the government attempts to distinguish *Craighead* by pointing out it is not binding on this Court and furthermore that in that case the law-enforcement agents descended on the defendant's home at 8:40 a.m.; he was escorted to an unfinished storage room where the door was closed behind him and one officer was leaning against the door in a way to block the defendant's exit; at least one officer was wearing a raid vest with a firearm showing; the defendant was denied access to a person on the scene

24

brought there to provide emotional support; and the Ninth Circuit held that despite being told he was not under arrest and free to leave, nonetheless the defendant subjectively believed that he was he was not free to leave and therefore in custody.  [*Id.* at 11-12 (citing *Craighead*, 539 at 1088-89)].  The government argues that *Craighead* is inapposite because (1) unlike *Craighead*, Kimbrell was not present when the agents showed up to execute the warrant and therefore cannot claim he was overwhelmed by the police show of force; (2) unlike *Craighead*, Kimbrell was not escorted to an unfinished storage room but rather chose to be interviewed in familiar and comfortable surroundings of his parents' bedroom; (3) unlike *Craighead*, where at least one FBI agent brandished his firearm, none of the questioning agents in this case displayed their weapons; (4) in *Craighead*, the defendant was denied access to a superior brought along for emotional support, where as here, both of Kimbrell's parents were present, he was sitting with his mother before being questioned, and he never asked to speak with either of them while being questioned; and (5) the Ninth Circuit's decision was grounded at least in part on the defendant's subjective testimony, whereas in the Eleventh Circuit, the test is objective and the record is silent as to Kimbrell's subjective feelings.  [*Id.* at 12-13].

25

*Discussion*

    *1.*    Franks *issue*

Search warrants, once issued, are presumed to be validly issued. *Franks*, 438 U.S. at 171. The burden of establishing that the warrant in this case was defective or executed improperly is therefore upon Kimbrell. *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981)[12]; *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980). When challenging the integrity of a warrant under the Fourth Amendment, a defendant must make a substantial showing of a "deliberate falsehood or reckless disregard for the truth" in the affidavit supporting the issuance of the warrant. *Green v. Nelson*, 595 F.3d 1245, 1251-52 (11th Cir. 2010) (quoting *Franks*, 438 U.S. at 171). If that standard is met, the affidavit should be examined with the incorrect assertions set aside to determine whether the remaining information is sufficient to establish probable cause. *Franks*, 438 U.S. at 171-72. " '[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.' "

---

[12]    The Eleventh Circuit has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

AO 72A
(Rev.8/82)

*United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (citations omitted). The defendant bears the burden of establishing that, absent misrepresentations or omissions, the warrant lacks probable cause.   *See United States v. Novaton*, 271 F.3d 968, 986-87 (11th Cir. 2001).

The Court finds that Kimbrell has not satisfied his *Franks* burden because, even if Scott should have explicitly informed the issuing judge that no child pornography was observed on any of Kimbrell's computer devices when the first warrant was executed, or should have cautioned that the presence of file-segment names does not mean that child-pornography images were reviewed, the application provided that Kimbrell told Scott that he had downloaded 200 child-pornography files.  Together with the affidavit's explanation that files which have been deleted by the user can be recovered by readily-available forensic tools, and frequently the data from deleted files remains on a computer's hard drive until overwritten by new data, [*see* Doc. 27-2 at 21], Kimbrell's statement constitutes probable cause that evidence likely would be found that showed that he had viewed and/or accessed child pornography on his computer.  *Kapordelis*, 569 F.3d at 1310 (holding that probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location);

27

*United States v. Frank*, No. 1:09cr20075, 2009 WL 2430909, at *6 (S.D. Fla. Aug. 7, 2009) ("Thus, given that it is undisputed that the Defendant allegedly transmitted video and picture images from his home computer at the end of July 2008, there was at least the required "fair probability" that those items or remnants of those items were capable of being retrieved from that same computer in January 2009, less than six months later, even if the Defendant had attempted to delete the files."). *Cf. United States v. Schwinn*, 376 Fed. Appx. 974, 979 (11th Cir. Apr. 28, 2010) ("The averment that collectors of child pornography rarely dispose of it and the additional averment that computer forensic techniques can recover even deleted files allowed a conclusion that a fair probability existed that evidence of child pornography remained after 10 months.") (citation omitted).

Thus, because probable cause to issue the warrant existed even if the alleged offending statements and omissions are set aside, Kimbrell is not entitled to a *Franks* hearing. The ultimate validity of the second search warrant, then, depends on whether Kimbrell's statements were properly obtained.

### 2.   *Custody for purposes of* Miranda *issue*

Notwithstanding the absence of a formal arrest, advice of *Miranda* rights is required if there is a restraint on freedom of movement "of the degree associated with

a formal arrest." *Minnesota v. Murphy,* 465 U.S. 420, 430 (1984); *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000); *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).  The test is objective; "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984).  This test "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also United States v. Torkington*, 874 F.2d 1441, 1445 (11th Cir. 1989) ("The relevant inquiry in this case is whether a reasonable person in [defendant's] position would have felt a restraint on his freedom equivalent to that normally associated with a formal arrest.") (citing *United States v. Phillips*, 812 F.2d 1355, 1359-60 (11th Cir. 1987)); *Phillips*, 812 F.2d at 1360 (holding that courts are to consider the totality of the circumstances).   "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person."  *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996) (emphasis added).  "[A]lthough a reasonable person in the defendant's position may feel constrained not to leave . . .— and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for

29

Fifth Amendment purposes." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).

The Eleventh Circuit considers several factors in applying this objective test, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal quotation marks omitted); *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989); *see also Howes v. Fields*, --- U.S. ----, ----, 132 S. Ct. 1181, 1189 (2012) (citations omitted) (identifying some factors to consider, including location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning); *Brown*, 441 F.3d at 1348-49 (holding that defendant was not in custody in part because he was in a familiar setting, his girlfriend's house, and because, "[a]lthough an officer accompanied him throughout the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished").

In addition, the fact that an investigation has focused on a suspect does not necessarily trigger the need for *Miranda* warnings. *Phillips*, 812 F.2d at 1360. The defendant's status as a suspect in the investigation and the "coercive environment" that

30

exists in virtually every interview by a police officer of a crime suspect do not automatically create a custodial situation. *See Muegge*, *id.* (civilian employee of military appeared at interview at military investigators' offices; not custodial); *Phillips*, 812 F.2d at 1360-61 (interview of suspect by police officers in station not custodial).

The defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.[13] *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978)[14] (holding that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination").

Under the totality of the circumstances, Kimbrell was not in custody when he was questioned in his parents' bedroom because there was no restraint on his freedom of movement of the degree associated with a formal arrest. None of the law enforcement officers brandished firearms, touched him in any way, or used language or a tone that indicated that compliance with the officers could be compelled. The

---

[13]    There is no dispute that Kimbrell was subjected to questioning.

[14]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/82)

circumstances simply do not approximate the coercion present in a formal arrest.  First, even assuming that Kimbrell and his parents were restricted in their movements in the residence while it was being searched, the search warrant provided the agents with the implicit authority to detain the occupants of the residence.  *Muehler v. Mena*, 544 U.S. 93, 95-98 (2005); *Summers*, 452 U.S. at 702-03 (holding that during a house search, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation"); *Croom v. Balkwill*, 645 F.3d 1240, 1249 (11th Cir. 2011); *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002) (holding that defendant was not "in custody" where defendant was told to sit down on the couch, interviewed for an hour, not allowed to get his own water (agents retrieved a drink for him), and escorted to the bathroom).   As the Supreme Court has observed, not all seizures of the person must be justified by probable cause to arrest for a crime.  *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion); *United States v. Roper*, 702 F.2d 984, 986 (11th Cir. 1983); *Gainor v. Douglas Cnty., Ga.*, 59 F. Supp. 2d 1259, 1271 (N.D. Ga. 1998) (Carnes, J.).  There is no evidence that either Kimbrell or his parents (in his presence) were denied permission to move around the house while the agents were present or were restricted in such a manner to have exceeded the legitimate bounds of a *Summers* detention.

32

Second, the location of the questioning points towards the questioning being non-custodial.  The questioning was in Kimbrell's home, and the Eleventh Circuit has noted that, although the location of the interview is not dispositive in determining whether the interviewee was in custody, courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.  *Brown*, 441 F.3d at 1348 (citations omitted; punctuation marks altered).  Also, the Court agrees with the government that it is significant that Kimbrell chose to be interviewed apart from his parents and chose his parents' bedroom to be interviewed.  Further, once in the bedroom, Kimbrell chose where to sit, and although the bulk of the questioning occurred in the bedroom in the presence of three law enforcement officers, the evidence is that the agents placed themselves on opposite sides of the room and did not block Kimbrell's exit.  Moreover, although the door to the bedroom was closed, the bedroom was on the same floor where Kimbrell's parents were seated, and thus he was not held in total isolation from his family members.

Third, "the evidence is undisputed that [the agents] questioned [Kimbrell] in a conversational, non-confrontational manner, the atmosphere was cordial and [Kimbrell] was cooperative," *United States v. Damiani*, Crim. Action File No. 1:10-CR-519-AT/AJB, 2011 WL 7574628, at *5 (N.D. Ga. Sept. 23, 2011), *adopted at*

2012 WL 983726, at *1 (N.D. Ga. Mar. 20, 2012) (citations omitted).  The questioning

was calm and conversational even when, during the "second session," Kimbrell was

confronted with the findings of the forensic examiners and the agents expressed

disbelief of Kimbrell's explanations as to how the files got on his computer.  In any

event, accusatory questioning alone has been held to be insufficient to render the

interrogation custodial.  *Stansbury*, 511 U.S. at 325 ("Even a clear statement from an

officer that the person under interrogation is a prime suspect is not, in itself, dispositive

of the custody issue, for some suspects are free to come and go until the police decide

to make an arrest."); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Nor is the

requirement of warnings to be imposed simply because . . . the questioned person is one

whom the police suspect.  *Miranda* warnings are required only where there has been

such a restriction on a person's freedom as to render him 'in custody.' "); *Beckwith v.*

*United States*, 425 U.S. 341, 346-47 (1976) (noting that it "was the compulsive aspect

of custodial interrogation, and not the strength or content of the government's

suspicions at the time the questioning was conducted, which led the Court to impose

the *Miranda* requirements with regard to custodial questioning"); *United States v.*

*Jayyousi*, 657 F.3d 1085, 1111-12 (11th Cir. 2011) (holding that accusing suspect of

lying did not make interview custodial); *United States v. Manor*, 936 F.2d 1238, 1241

(11th Cir. 1991) ("*Miranda* is not implicated simply because an individual is the subject

or target of an investigation.") (citing *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984)).

Pointed questioning does not necessarily convert a non-custodial interview into a

custodial interrogation, as the Supreme Court held in *Mathiason*,

> a noncustodial situation is not converted to one in which *Miranda* applies
> simply because a reviewing court concludes that, even in the absence of
> any formal arrest or restraint on freedom of movement, the questioning
> took place in a "coercive environment."  Any interview of one suspected
> of a crime by a police officer will have coercive aspects to it, simply by
> virtue of the fact that the police officer is part of a law enforcement system
> which may ultimately cause the suspect to be charged with a crime.  But
> police officers are not required to administer *Miranda* warnings to
> everyone whom they question.  Nor is the requirement of warnings to be
> imposed simply because . . . the questioned person is one whom the police
> suspect.

*Mathiason*, 429 U.S. at 495; *see also Muegge*, 225 F.3d at 1270 (stating that "the

'coercive environment' that exists in virtually every interview by a police officer of a

crime suspect" does not automatically create a custodial situation).[15]

Moreover, while the questioning was pointed, it did not rise to the level of

repeatedly accusing Kimbrell of lying, which other courts have found transforms a

---

[15]     It also is important to keep in mind that the Supreme Court has recognized
that the voluntariness inquiry and the *Miranda* custody inquiry are not one and the
same, *see Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004), since the former
relies, at least in part, on the subjective characteristics of the suspect (for example, his
age), while the *Miranda* inquiry is objective.

AO 72A
(Rev.8/82)

non-custodial interview into custodial questioning.  *See United States v. Lanni*, 951 F.2d 440, 443 (1st Cir. 1991) (weighing agent's expression of disbelief at suspect's profession of innocence in favor of custody); *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (holding that agents had placed defendant in custody by, among other actions, "accusing [him] repeatedly of lying" and "insisting on the 'truth' until he told them what they sought").[16]  Instead, as in *Peck*, the tone of the questioning as demonstrated by the recording was conversational, calm, deliberate, and not threatening, and it did not convey that compliance was compelled.  *See Peck*, 17 F. Supp. 2d at 1365.  Thus, Kimbrell has not shown that either the extent or the timing of these statements rose to the level of compulsion, which would tip the scales from a noncustodial interview to a custodial one.

Fourth, the questioning was not so lengthy as to convert the encounter into a custodial one.  *McDowell*, 250 F.3d at 1363 (noting that "there is no fixed time limit to the length of questioning" and finding four-hour interview was not a custodial interrogation); *Muegge*, 225 F.3d at 1269-71 (finding no custody where defendant was directed by his supervisor to speak with investigators in a secure location where he was

---

[16]    Of course, case law from other circuits is not binding on this Court. *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004); *Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985).

interviewed for about two and a half hours and was not formally arrested until almost eight months later); *United States v. Manta-Carillo*, Criminal No. 11-00103-CB, 2011 WL 3235757, at *2, 4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half); *United States v. Dix*, No. 3:12-cr-7-TCB-RGV, 2013 WL 610219, at *5 (N.D. Ga. Jan.29, 2013) (finding defendant was not in custody when officers entered his store with weapons drawn to execute search warrant, handcuffed defendant, and escorted defendant outside where he was immediately un-handcuffed and then interviewed by two agents in an unmarked government truck for an hour and a half). *Accord United States v. Hughes*, 640 F.3d 428, 435-37 (1st Cir. 2011) (holding that suspect was not in custody where the interview occurred in his home; the number of officers was "impressive but not overwhelming" and only two officers participated in the questioning; there was no show of force and no weapons were brandished; the defendant was not restrained physically; the "ambiance was relaxed and non-confrontational"; and the interview lasted for ninety minutes—a "relatively short duration").

Fifth, Kimbrell was told at the beginning of the interview that he was not under arrest and that Scott wanted to make sure he was there voluntarily. Kimbrell does not point to any authority that supports his argument that Scott's initial statement that he

37

was not under arrest needed to be repeated later in the questioning to be effective.  The Court's research also discloses no such authority, but has uncovered several cases that, at a minimum, suggest the validity of the opposite proposition.  *See Mathiason*, 429 U.S. at 493 (suspect told only once that he was not under arrest, but was found not to be in custody); *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011) (holding that officer did not need to re-advise upon continuing interview); *United States v. Salyers*, 160 F.3d 1152, 1159-60 (7th Cir. 1998) (no custody during execution of a search warrant because defendant neither restrained nor told he could not leave).  In any event, even if Scott should have advised Kimbrell again that he was not under arrest, that fact is only one circumstance in a totality that points to a finding of no custody.

Sixth, the Court rejects Kimbrell's argument that his job as a teacher made him more likely to cooperate.  That argument incorrectly applies a subjective element to what is an objective test.  Such reasoning ignores the lack of any physical force or coercive tactics by law enforcement, and focuses on the supposed predisposition of a particular suspect to cooperate, and the Court is not allowed to do that in this context.  The test, in other words, involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning.  *Alvarado*, 541 U.S. at 667; *see also id.* at 668 (noting that officers are under no duty "to consider . . . contingent

38

psychological factors when deciding when suspects should be advised of their *Miranda* rights").

Seventh, the Court notes that the circumstances in *Asher* and *Peck*, where this Court found that the defendants were not in custody, to be materially indistinguishable from the present case. If anything, Kimbrell's case presents a far weaker showing of custody than those cases if only because Kimbrell did not experience the early morning "shock and awe" of armed police officers gaining entry to the residence to search it as did Asher and Peck. The record evidence shows that the search had already begun when Kimbrell arrived home, with advance knowledge that his home was being searched in a child-pornography investigation. In fact, Kimbrell already had interacted with Scott in a cooperative way at school, and the Court's review of the audio-recorded questioning at the home supports Scott's perception that Kimbrell was trying to clear himself by his cooperation both at the school and his home, and was not cooperating due to any actual or perceived conditions approximating a full-blown arrest.

If *Asher* and *Peek* are no help to Kimbrell, *Craighead*, by comparison, shows that Kimbrell's situation was not custodial. Even ignoring the subjective standard used by the Ninth Circuit, in *Craighead*, the defendant was directed to an unfinished storage area, where he sat on a box, was questioned by at least one weapon-brandishing officer,

39

and the exit door was blocked by an officer.  In the present case, Kimbrell chose his parents' bedroom to be questioned, chose to sit on his parents' bed during the encounter, none of the agents displayed firearms, and there is no evidence that the exit door was blocked.  As a result, *Craighead* is not supportive of Kimbrell's motion to suppress evidence.

Accordingly, the totality of the circumstances demonstrates that Kimbrell was not in custody, and thus he was not entitled to *Miranda* warnings.[17]

_____

[17]    Kimbrell contended in his initial motion that his statements were involuntary, but he did not raise that issue in his post-hearing brief.  In any event, the Court finds that his statements were voluntary.  The primary focus of the voluntariness inquiry is whether there has been police overreaching.  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010).  The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics."  *Id.*  Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him."  *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (citation and quotations omitted).  Among the factors to consider are the defendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques, and whether the defendant was advised of his constitutional rights.  *Id.*

Of these factors, only the failure to provide Kimbrell with his *Miranda* warnings points toward involuntariness.  Kimbrell was highly educated and intelligent.  As noted, his detention was both lawful and not lengthy in duration.  The agents did not employ either physical or mental coercion upon Kimbrell.  That the agents told him or implied that they did not believe his denials did not render his statements involuntary.  A confession is involuntary and subject to suppression when induced by such duress or

coercion, express or implied, that the accused's "will has been overborne and his capacity for self-determination critically impaired."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).  As the Fourth Circuit noted in *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980):

> [I]t is important always to bear in mind that "the voluntariness of a confession cannot be equated to the absolute absence of intimidation," *Johnson v. Hall*, [ ] 605 F.2d 577, 582 n.8 [ (1st Cir. 1977) ], for "[u]nder such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind."

Similarly, in *United States v. Ballard*, 586 F.2d 1060 (5th Cir. 1978), the court stated:

> Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him "holding the bag" does not, as a matter of law, overcome a confessor's will . . . .   Neither is a statement that the accused's cooperation will be made known to the court a sufficient inducement so as to render a subsequent incriminating statement involuntary. . . . A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will.  Such an account may increase the chance that one detained will make a statement.  However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made. . . . [T]elling the appellant in a noncoercive manner of the realistically expected penalties and encouraging her to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government.

*Id.* at 1063 (citations omitted); *see United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir.1983) (holding that "a mere admonition to the accused to tell the truth does not render a confession involuntary"); *United States v. Barfield*, 507 F.2d 53, 56 (5th Cir. 1975) ("[A]n officer's admonition to tell the truth . . . does not of itself measure

41

Therefore, Kimbrell's motions to suppress statements should be denied.

### Conclusion

Because the Court concludes that Kimbrell's statements were properly obtained, the statement he made to Scott about downloading "a couple hundred" child-pornography images was properly included in the second search warrant affidavit. Accordingly, the undersigned **RECOMMENDS** that Kimbrell's motions to suppress evidence, [Docs. 12, 27], and statements, [Docs. 13, 37], be **DENIED**.

The Court has now ruled on all matters referred to it and has not been advised of any impediments to the scheduling of trial. As a result, this case is **CERTIFIED READY FOR TRIAL**.

---

up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."); *see also United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (pounding fist on the table while accusing defendant of lying does not negate voluntariness); *United States v. Bailey*, 979 F. Supp. 1315, 1318 (D. Kan. 1997) ("Merely exhorting [defendant] to start telling the truth did not render his confession involuntary."). Thus, the agents' somewhat pressing questions about Kimbrell's downloading of child pornography, including telling him that there were downloads after July 2013, did not render his statements involuntary. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding police officer's false statement to defendant that companion confessed insufficient to make otherwise voluntary statement involuntary).

As a result, under the totality of circumstances, the undersigned finds that Kimbrell's statements were voluntary.

AO 72A
(Rev.8/82)

**IT IS SO RECOMMENDED and CERTIFIED**, this  22nd   day of  June ,
2015.

<u>                                        </u>
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

43